# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |
|---|---|
| IN RE 2022 CELLULAR TELEPHONE COORDINATED PARTNERSHIP LITIGATION | COORDINATED C.A. No. 2022-1078-JTL |

THIS FILING APPLIES TO COORDINATED C.A. No. 2022-1087-JTL

## MEMORANDUM OPINION DENYING MOTION TO DISMISS NEWLY ADDED CLAIMS

Date Submitted: April 14, 2026
Date Decided: July 31, 2026

Norman M. Monhait, Jessica Zeldin, REID COLLINS & TSAI LLP, Wilmington, Delaware; William T. Reid, IV, Gregory S. Schwegmann, Emma Culotta, REID COLLINS & TSAI LLP, Austin, Texas; Rachel S. Fleishman, Marc Dworsky, REID COLLINS & TSAI LLP, New York, New York; Michael Pullara, David Siegel, MICHAEL PULLARA LAW FIRM, Houston, Texas; *Attorneys for Plaintiffs.*

Michael A. Barlow, Veronica B. Bartholomew, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Wilmington, Delaware; Michael B. Carlinsky, Adam M. Abensohn, George T. Phillips, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; *Attorneys for Defendants.*

John L. Reed, Peter H. Kyle, Daniel P. Klusman, Michael A. Carbonara, Jr., DLA PIPER LLP (US), Wilmington, Delaware; *Attorneys for Nominal Defendants.*

**LASTER, V.C.**

A Delaware limited partnership provided wireless service in rural Oklahoma. Through affiliates, AT&T, Inc. held limited partnership interests in the partnership and served as its general partner. Two other business entities were its only other limited partners. In this lawsuit, the two limited partners contend that AT&T and its affiliates failed to properly allocate revenue and expenses to the partnership, depriving the partnership of millions of dollars of profit and the limited partners of the resulting distributions.[1]

After the court denied AT&T's initial motion to dismiss, the plaintiffs amended their complaint to assert two new legal theories (the "New Expense Claims"). One contends that AT&T breached the partnership agreement by charging the partnership for interconnect service at greater than cost (the "Interconnect Claim"). The other contends that AT&T breached the partnership agreement by causing the partnership to lease spectrum from AT&T at greater than cost (the "Spectrum Claim").

AT&T moved to dismiss the New Expense Claims as untimely. That motion is denied. The New Expense Claims can challenge transactions effectuated within three years of the filing of the operative complaint. For the Interconnect Claim, that means reaching back to 2019, and for the Spectrum Claim, that means reaching back to 2022. It is possible that the plaintiffs can reach back further because equitable tolling

---

[1] While important for many purposes, the distinctions among the entities through which AT&T acted are not significant for purposes of this motion. For simplicity, this decision refers solely to AT&T.

inferably applies, but it is also possible that the plaintiffs were on inquiry notice and are unable to invoke equitable tolling. The answer to the tolling issue depends on factual determinations that the court cannot make at the pleading stage. The motion to dismiss on timeliness grounds is therefore denied.

AT&T also moved to dismiss the New Expense Claims on the merits to the extent they asserted claims for breach of contract. That motion is denied as well.

## I.     FACTUAL BACKGROUND

The facts are drawn from the operative complaint, documents integral to the complaint or incorporated by reference, and documents subject to judicial notice.[2] At this procedural stage, the court must credit the complaint's well-pled allegations and draw all reasonable inferences in the plaintiffs' favor.

---

[2] The operative complaint is the Second Amended Verified Derivative Complaint in Civil Action 2022-1087-JTL (the "Cherokee Action"). There are actually eleven Second Amended Verified Derivative Complaints and three Second Amended Verified Derivative and Direct Complaints, one for each of the fourteen actions coordinated for pre-trial purposes under this caption. *See* Dkts. 135–136, 141–152. Each action relates to a different partnership. The parties have sought to brief all of the issues involving all of the partnerships all at once, but the partnership agreements differ, the factual allegations differ, and sometimes the governing law differs. Trying to address everything all at once generates confusion and heightens the risk of error. This decision resolves the motion to dismiss in the Cherokee Action. The court will enter targeted orders or, if necessary, decisions addressing the other actions.

References and citations to the "complaint" mean the currently operative complaint in the Cherokee Action. Dkt. 148. Citations in the form "OB __," "AB __," and "RB ___" refer to the parties' opening, answering and reply briefs, respectively. *See* Dkts. 183, 200, 208. Citations in the form "Ex. ___ at ___" refer to exhibits the defendants submitted in support of their motion to dismiss. Page references cite internal pagination whenever possible.

## A.     Spectrum Licenses

Cellular telephones send and receive communications using frequencies on the electromagnetic spectrum. The Federal Communications Commission ("FCC") regulates who can use portions of spectrum and for what purposes.

In 1981, the FCC allocated spectrum for cellular telephones. The agency established 734 geographic markets called Cellular Market Areas or "CMAs." The FCC made two blocks of spectrum available in each CMA: one through a "Block A" license and the other through a "Block B" license.

The FCC generally awarded Block A licenses by lottery. Investors formed groups, called settlement associations, to increase their chances of winning. Like employees who form an office pool to buy lottery tickets with an agreement to split any winnings, the members of a settlement association agreed that if one of them won the license, then the winning member would contribute it to a partnership in which all of the members would participate. Under the standard agreement, the winning member would receive at least a 50.01% interest in the partnership with other members sharing the balance. The resulting partnerships typically affiliated with a national cellular telephone carrier so they could be part of a larger network.

The FCC awarded the Block B license differently. It went to the incumbent landline carrier in each CMA. If multiple carriers served a CMA, then the Block B license went to an entity that the incumbent carriers owned jointly.

## B.     The Partnership

AT&T, Cherokee Telephone Company, and Chickasaw Telephone Company were the incumbent carriers in a CMA in rural Oklahoma.[3] In 1989, they formed the Oklahoma RSA 9 Limited Partnership (the "Partnership") to own the Block B license for that CMA.

When the parties formed the Partnership, they entered into a partnership agreement to govern its affairs (the "Partnership Agreement").[4] The Partnership Agreement designated AT&T as the General Partner.[5] AT&T owned a 63.2% interest in the Partnership, while Cherokee owned a 20% interest and Chickasaw owned a 16.8% interest.

The purpose of the Partnership was to "fund, establish and provide Cellular Service," initially in the area covered by its license but with the possibility of expanding "to include other areas."[6] The Partnership Agreement defined "Cellular Service" broadly as:

> Any and all services authorized by the FCC under Part 22 of its cellular rules, as amended from time to time, as promulgated under the Cellular Radio Decisions, and/or provided pursuant to the terms of this

---

[3] At the time, the corporation now known as AT&T was known as Southwestern Bell Corporation. In 2004, Southwestern Bell merged with what was then AT&T and changed its name to AT&T. The entity is the same. For simplicity, this decision refers to AT&T.

[4] Ex. 1 (cited as "PA").

[5] It was actually an affiliate, but as noted, the distinction between AT&T and its affiliates are not important for purposes of this decision.

[6] PA § 1.3.

Agreement. Such cellular service may include, but is not limited to, both wholesale and retail distribution of such authorized service. The Partners acknowledge that the Partnership may also engage in other ancillary activities which the General Partner in good faith determines to be in the best interests of the Partnership.[7]

Demonstrating that the Partnership intended to provide cellular service as part of a wider network, the Partnership Agreement made the General Partner responsible for "obtaining interconnection with the landline network, for operating and maintaining the Cellular Service system, and for marketing Cellular Service."[8]

The General Partner's responsibilities included providing "management and accounting services to the Partnership consisting of, but not limited to, maintaining books of record, … preparing accounting reports (in accordance with generally accepted accounting principles …), and other records and reports" (the "Services Provision").[9] The same provision authorized the General Partner to provide "as necessary, certain other services necessary for the Partnership to carry on and expand its activities and functions, including but not limited to, real estate management, advertising, legal, office personnel management, engineering, marketing and the like."[10]

---

[7] *Id.* § 2.4.

[8] *Id.* § 4.1.

[9] *Id.*

[10] *Id.*

Next, the Partnership Agreement addressed payment for the General Partner's services:

[T]he General Partner shall be reimbursed by the Partnership monthly for any reasonable and necessary expenses incurred by the General Partner on behalf of the Partnership in providing, and preparing to provide, Cellular Service plus reasonable and necessary administrative and general overhead expenses, including, but not limited to, marketing, maintenance, message charges, facilities, engineering, legal, accounting and audit fees, development and implementation of billing procedures, expenses of preparing tax returns and reports, taxes, travel, office rent, telephone, salaries …, and any and all other business expenses incurred by the General Partner on behalf of the Partnership in connection with the provision of Cellular Service.[11]

The same provision specified that "[t]he General Partner shall not be entitled to any profit in rendering such services to the Partnership" (the "No-Profit Requirement").[12] To drive that point home, the provision emphasized that the partners intended instead for the General Partner to receive "its proportionate allocated share of income and losses."[13]

The Partnership Agreement separately authorized the General Partner to buy or lease assets from the General Partner or its affiliates and, if warranted, hold assets as the Partnership's nominee (the "Asset Provision"). The same provision required that any transactions be "upon terms and conditions reasonably comparable to those

[11] *Id.* § 4.2.

[12] *Id.*

[13] *Id.*

6

which the Partnership could obtain at arm's length from unaffiliated parties" (the "Arm's-Length Requirement").[14]

Another section of the Partnership Agreement identified a list of actions that the Partnership had the express power to take. The list included the power "[t]o enter into, perform and carry out contracts and agreements of every kind necessary or incidental to the accomplishment of the Partnership's purposes, including, without limitation, contracts and agreements with the General Partner and Affiliates of the General Partner."[15] The next section identified a list of actions that the General Partner had the express power to take on the Partnership's behalf, including "to establish interconnection and switching arrangements with other cellular carriers in areas adjoining the RSA and elsewhere upon such terms as the General Partner deems necessary or appropriate and in the best interest of the Partnership."[16]

A final section, titled "Conflict of Interest," revisited the subject of interested transactions (the "Affiliate-Transaction Provision"). It stated:

> The General Partner and its Affiliates shall have the right to contract or otherwise deal with the Partnership for the sale or lease of real or personal property, the rendition of services and other purposes, and to receive payments and fees from the Partnership in connection therewith, provided that the terms and conditions of such transactions are comparable to, or not substantially less favorable than, similar arms'-length transactions between the General Partner or its Affiliates and unrelated third parties. The Partners recognize that the General Partner may have conflicting duties to its many Affiliates including

---

[14] *Id.* § 4.3.

[15] *Id.* § 7.1.

[16] *Id.* § 7.2.

7

without limitation in transactions between two of its Affiliates. In the absence of gross negligence or willful misconduct, the General Partner's resolution of such conflict of interest shall not constitute a breach of this Agreement or any other agreement contemplated herein.[17]

The Affiliate-Transaction Provision thus nominally required arm's-length terms, but stated that a breach would not exist "[i]n the absence of gross negligence or willful misconduct" (the "Conduct Standard").

## C.    NPA-NXX Accounting

Starting in the 1980s, the wireless industry tracked subscribers and usage using the "NPA-NXX" system, a shorthand term for the area code and next three digits of the subscriber's phone number. For example, in the phone number 999-555-1234, the NPA-NXX is 999-555. Adding the last four digits yields a block of 10,000 possible phone numbers, ranging from 999-555-0000 to 999-555-9999.

Wireless carriers assigned NPA-NXX blocks based on geography. AT&T assigned blocks of NPA-NXX numbers to particular market-level entities, like the Partnership, that served specific geographic areas.

When signing up with a carrier, a customer received a ten-digit telephone number from the NPA-NXX block that corresponded to the customer's principal place of use. Wireless carriers used the ten-digit telephone numbers to track subscribers and non-subscribers using their networks. They charged roaming fees when a customer used a cellular telephone outside the customer's principal place of use.

---

[17] *Id*. § 7.5.

AT&T used the NPA-NXX system to allocate revenue and expenses to market-level entities like the Partnership. The allocated items included:

- Monthly recurring revenue attributable to the Partnership's subscribers;

- Outcollect roaming revenue attributable to non-subscribers roaming in the Partnership's geographic area;

- Incollect roaming expense attributable to the Partnership's subscribers roaming outside the Partnership's geographic area; and

- Other expenses attributable to operating AT&T's national network.

For approximately two decades, two factors worked in combination to cause the NPA-NXX system to generate reasonably accurate allocations. First, a subscriber who wanted to change cellular carriers had to give up their old number and get a new one. The new number would correspond to the customer's new principal place of use. Second, a subscriber who moved to a new geographic area without changing their principal place of use or securing a new number with an NPA-NXX assigned to that area would incur roaming charges, giving the subscriber a financial incentive to change numbers or update their principal place of use.

But as technology evolved, three developments caused the NPA-NXX system to become less and less accurate. The first was number portability, mandated by the Telecommunications Act of 1996 and effective starting in 2003. After number portability, a subscriber who moved out of the Partnership's geographic area could keep a telephone number associated with an NPA-NXX block issued to the Partnership, even though the subscriber was no longer a Partnership customer or using the Partnership's assets. Conversely, a subscriber who became a Partnership

9

customer could keep a telephone number associated with a different NPA-NXX block, even though the subscriber was now using the Partnership's assets. The NPA-NXX system did not reflect those changes. Under AT&T's allocation system, the Partnership continued to receive revenue and incur expenses for subscribers with affiliated-NPA-NXX numbers who moved out of the Partnership's area, while never receiving revenue or incurring expenses for subscribers with unaffiliated-NPA-NXX numbers who moved into the Partnership's area. The exception was roaming, because AT&T would treat a subscriber with an NPA-NXX number affiliated with the Partnership as roaming whenever outside the Partnership's area, even if the subscriber had moved. Likewise, AT&T would treat a subscriber with an NPA-NXX number affiliated with a different geographic area as roaming whenever in the Partnership's area, even if the subscriber had now lived there.

The second development was the emergence of national rate plans that allowed subscribers to use their phones anywhere in the United States without incurring roaming charges. A subscriber who moved therefore no longer had a financial incentive to secure a telephone number with an NPA-NXX number associated with their principal place of use. Yet despite eliminating roaming for subscribers, AT&T continued to impose roaming charges internally. The Partnership therefore had to pay roaming charges for any affiliated-NPX-NXX numbers used outside the Partnership's geographic area, even if the subscriber had moved. Likewise, other market-level entities had to pay roaming charges to the Partnership for any NPA-

NXX numbers associated with other geographic areas when they were used in the Partnership's area.

The first two developments broke the link between NPA-NXX and principal place of use. The third development was AT&T's expansion into non-traditional wireless businesses, which broke the link between traditional cellular telephone use and a fair allocation of revenue and expenses. AT&T found ways to use its national network to host new types of devices and provide new products, such as geolocation services, communication with products through the Internet of Things, and the collection and sale of Big Data. AT&T even sold handset insurance. Those businesses generated revenue because of AT&T's ability to supply a national network. But even though entities like the Partnership were part of the network, AT&T did not allocate any portion of the profit to the market-level entities. The same was true for subscriber data. When collecting and selling subscriber data, AT&T commingled data from all of its subscribers without allocating any portion of the profits to market-level entities like the Partnership for their share of AT&T's subscribers.[18]

---

[18] For example, in spring 2009, AT&T announced that it was working with major corporate partners to develop new applications for devices that would transmit data without a cellular telephone. AT&T contracted to supply those applications on a national basis. Under the resulting contracts, AT&T committed the Partnership to provide services for the devices for the new customers. Yet AT&T did not allocate a share of the value from the business to market-level entities like the Partnership. AT&T simply paid the Partnership and other market-level entities the same fee that it paid a competitor when an AT&T device pinged on that competitor's network. AT&T did not share any of the value associated with its network as a whole, even though market-level entities like the Partnership were essential parts of the network.

Collectively, these developments rendered the NPA-NXX accounting system both unreliable and unfair. The NPA-NXX accounting method used individual subscriber counts and usage to allocate revenue and most expenses to market-level entities like the Partnership, but NPA-NXX accounting became so unreliable that AT&T could not provide basic information about its subscribers, such as:

- The number of subscribers who resided in any specific partnership's geographic area but used another partnership's NPA-NXX numbers;

- The number of subscribers who resided outside any specific partnership's geographic area but used an NPA-NXX number assigned to that partnership;

- The number of subscribers who had moved to a different geographic area, changed their billing address and principal place of use to an address in that geographic area, yet continued to use another partnership's NPA-NXX number; or

- The number of subscribers who resided in a geographic area different from the one that issued their NPA-NXX number.

The allocations that the NPA-NXX system generated became arbitrary.

### D. The Better But Never-Implemented Allocation Method

By 2005, AT&T recognized that changing technological and market conditions necessitated new accounting methods. Around that time, AT&T entered into Management and Network Sharing Agreements (the "Sharing Agreements") with a number of its market-level affiliates. AT&T drafted the Sharing Agreements and backdated them to be effective as of January 1, 2003.

The Sharing Agreements established new methods for allocating expenses. They identified interconnect expense as an "Out-of-Pocket Expense" that AT&T

12

charged at cost.[19] They also provided for spectrum lease expense to be charged at cost. And they addressed roaming by establishing that subscribers could roam on AT&T's network "without any direct charges."[20]

AT&T's decision to enter into the Sharing Agreements supports a pleading stage inference that AT&T recognized that its NPA-NXX-based system for allocating revenue and expenses was unfair. The Sharing Agreements also recognized that conditions could continue to change and authorized AT&T to revise its accounting procedures from time to time "provided that any new methodology fairly accounts for the revenues and expenses of Owner's Business."[21]

AT&T never entered into a Sharing Agreement with the Partnership. AT&T also never adopted the methods identified in the Sharing Agreements for allocating revenue and expenses to the Partnership. Instead, AT&T continued to use the NPA-NXX methodology.

By continuing to use the NPA-NXX methodology for the Partnership, AT&T accounted for its revenue and expenses to the Partnership as if it were an independent, stand-alone entity whose business had not progressed beyond providing

---

[19] Compl. ¶ 54.

[20] *Id.* ¶ 53.

[21] Compl. Ex. 1 § VI(A); *see also id.* § VI(B) ("Manager may change the way it calculates the specified rate from time to time in order to adapt to changing market and technological conditions, provided that the rate is always calculated in a way that the cost Owner pays is in proportion to the benefit Owner's Business receives from the Shared Network relative to the benefit Manager's Business receives.").

voice and basic data services to a limited group of subscribers in a specific geographic area. For its own purposes, by contrast, AT&T managed the Partnership's assets as if an integrated part of its national network. Operationally, AT&T treated the Partnership's assets as if they were part of AT&T's national footprint.

AT&T's continued use of the NPA-NXX accounting method reduced the Partnership's profits by limiting the revenue attributable to the Partnership's assets. As a result, the Partnership generated lower profits and smaller annual distributions than it would have if AT&T used fair methods like those in the Sharing Agreements to allocate revenue.

**E.     The Issues Giving Rise To The New Expense Claims**

Despite not updating its accounting methods, AT&T did allocate some types of new expenses to the Partnership. One was interconnect expense. The other involved spectrum leasing. Those expenses form the basis for the New Expense Claims.

Interconnect expense recognizes that after a cellular telephone sends a radio signal to a tower, the signal moves through AT&T's national network to its destination by passing through a series of switches. AT&T entered into contracts with its landline market-level entities to provide interconnect service free of charge to all AT&T cellular sites in their regions.

AT&T did not include its cellular market-level entities in those contracts. Instead, AT&T billed its cellular market-level entities at its standard interconnect rates, which were above AT&T's cost and reflected the amounts that AT&T would charge a third-party carrier that used a portion of AT&T's network. AT&T then aggregated the total interconnect expense for its cellular market-level entities and

14

allocated a portion to the Partnership. As a result, the Partnership paid AT&T as if the Partnership were a third-party carrier, rather than part of AT&T's network. AT&T also never removed "dead circuits" from its accounting system, forcing the Partnership to pay for wires that no longer carried data.

AT&T also allocated spectrum expense to the Partnership. Under an agreement dated September 8, 2015 (the "Spectrum Lease"), AT&T caused the Partnership to lease spectrum from AT&T at rates above AT&T's cost. Over time, AT&T added additional spectrum to the Spectrum Lease and increased the fees it charged to the Partnership.

## F.  *In re Cellular Telephone Partnership Litigation*

In 2010 and 2011, former minority partners in thirteen cellular partnerships sued AT&T. After a decade-long litigation culminating in a five-day trial, the court issued two post-trial opinions. One addressed the plaintiffs' claims for breach of contract (the "Contract Decision").[22] The other addressed the plaintiffs' breach of fiduciary duty claims (the "Fiduciary Duty Decision").[23]

The plaintiffs allege that they learned how AT&T managed the Partnership by reading the Contract and Fiduciary Duty Decisions. The plaintiffs allege that they did not previously know how AT&T allocated revenue and expenses.

---

[22] *In re Cellular Tel. P'ship Litig.*, 2021 WL 4438046 (Del. Ch. Sept. 28, 2021).

[23] *In re Cellular Tel. P'ship Litig.*, 2022 WL 698112 (Del. Ch. Mar. 9, 2022).

15

**G.     This Litigation**

On November 28, 2022, the plaintiffs sued AT&T Inc. and five of its affiliates. The plaintiffs filed the currently operative complaint that added the New Expense Claims on October 27, 2025. The Interconnect Claim asserts that AT&T breached the Partnership Agreement by overcharging the Partnership for interconnect service. The Spectrum Claim contends that AT&T overcharged the Partnership under the Spectrum Lease. The plaintiffs' earlier complaint had not specifically identified those expenses or called out the sections in the Partnership Agreement that AT&T allegedly breached by charging them. Aspects of the New Expense Claims appear in Counts I, III, IV, V, VI, and VII of the complaint.

## II.     LEGAL ANALYSIS

AT&T has moved to dismiss the New Expense Claims under Rule 12(b)(6). When considering that type of motion, "a trial court should accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as 'well-pleaded' if they provide the defendant notice of the claim, [and] draw all reasonable inferences in favor of the plaintiff."[24] The court should "deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[25] Delaware's "governing 'conceivability' standard

---

[24] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[25] *Id.*

16

is more akin to 'possibility,' while the federal 'plausibility' standard falls somewhere beyond mere 'possibility' but short of 'probability.'"[26]

## A.    The Timeliness Defense

AT&T argues that the New Expense Claims are untimely. For a court to grant a Rule 12(b)(6) motion on timeliness grounds, the complaint's allegations must establish that the claim was filed too late.[27] When evaluating whether a complaint's allegations support a timeliness defense, a court "must draw the same plaintiff-friendly inferences required in a 12(b)(6) analysis."[28] When reviewing a timeliness defense, the "court effectively assumes the validity of the claims, then applies timeliness principles."[29]

### 1.    Statute Of Limitations Versus Laches

The Court of Chancery uses two conceptual frameworks to analyze timeliness: the statute of limitations and laches.[30] Court of Chancery decisions traditionally analyze at the outset which framework should be used.

---

[26] *Id.* at 537 n.13.

[27] *Lebanon Cty. Emps.' Ret. Fund v. Collis*, 287 A.3d 1160, 1193 (Del. Ch. 2022) (citing *Kahn v. Seaboard Corp.*, 625 A.2d 269, 277 (Del. Ch. 1993)).

[28] *State ex rel. Brady v. Pettinaro Enters.*, 870 A.2d 513, 524–25 (Del. Ch. 2005).

[29] *Collis*, 287 A.3d at 1193.

[30] *See Whittington v. Dragon Gp., L.L.C.*, 991 A.2d 1, 7 (Del. 2009) ("Both the doctrine of laches and statutes of limitations function as time bars to lawsuits.").

A statute of limitations presumptively bars claims that a plaintiff does not file within a statutorily specified period.[31] Laches, by contrast, is theoretically a more flexible doctrine because it places the burden on the defendant to make two fact-based showings: (i) establishing that the plaintiff delayed unreasonably in bringing a known claim, and (ii) demonstrating prejudice caused by the delay.[32] But Delaware law treats delay beyond the analogous statutory limitations period as presumptively unreasonable for purposes of laches.[33] Moreover, in *Moelis*, the justices extended that

---

[31] *Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 974–75 (Del. Ch. 2016).

[32] *Levey v. Brownstone Asset Mgmt., LP*, 76 A.3d 764, 769 (Del. 2013).

[33] *Moelis & Co. v. W. Palm Beach Firefighters' Pension Fund*, --- A.3d ---, ---, 2026 WL 184868, at *15 (Del. Jan. 20, 2026) ("[T]he plaintiff has presumptively delayed unreasonably in bringing its claim against Moelis by filing it well outside the analogous limitations period."); *accord Levey*, 76 A.3d at 769 ("A filing after the expiration of the analogous limitations period is presumptively an unreasonable delay for purposes of laches."). Before *Moelis*, trial court decisions had asserted that delaying beyond the analogous limitations period presumptively caused prejudice, but the Delaware Supreme Court had not yet adopted that rule nor applied it to a case where none of the facts were in dispute. Tracing the trial court line of authority ends in a Chancery Court decision from 2013 in which the court stated without citation that "[a]fter the statute of limitations has run, defendants are entitled to repose and are exposed to prejudice as a matter of law by a suit by a late-filing plaintiff who had a fair opportunity to file within the limitations period." *In re Sirius XM S'holder Litig.*, 2013 WL 5411268, at *4 (Del. Ch. Sept. 27, 2013). For an equitable claim to which laches traditionally applied, that reasoning is circular. Digging further leads to a Chancery Court decision stating, "[i]n the absence of unusual or mitigating circumstances, where the analogous statute of limitations at law period has run, a plaintiff is barred from bringing suit without the necessity of the court engaging in a traditional laches analysis." *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 1594085, at *12 (Del. Ch. June 29, 2005). The court cited two decisions to support that statement; both applied laches to legal claims seeking money damages, which presented a narrower situation. *See U.S. Cellular Inv. Co. of Allentown v. Bell Atl. Mobile Sys., Inc.*, 677 A.2d 497, 502 (Del. 1996) (breach of contract); *Atlantis Plastics Corp. v. Sammons*, 558 A.2d 1062, 1064 (Del. Ch. 1989) (fraud).

18

presumption to hold that delay beyond the analogous limitations period presumptively prejudices the defendant, even in a case that did not require any factual development and could be decided as a matter of law.[34] The court hastened to add that "[t]his is not to say that the presumption that an action is barred by laches if it is filed after the analogous statute of limitations has elapsed is irrebuttable," but the exceptions it cited were (i) a line of cases allowing a court to set aside the statute of limitations for "unusual conditions or extraordinary circumstances" and (ii) tolling doctrines, which apply equally to the statute of limitations.[35] At present, therefore, the principal difference between the timeliness doctrines is that laches can bar a claim brought *within* the limitations period if there are reasons it should have been brought sooner.[36]

---

[34] *Moelis*, 2026 WL 184868, at *15 ("Although the defendant raising an affirmative defense bears the burden of satisfying each element of that defense, it does not follow that, to invoke the doctrine of laches, a defendant must in all cases show that its defense of the claim at issue would be hampered by loss of evidence, faded memories, or some substantive change in the situation of the parties or property at issue.") (citations omitted).

[35] *Id.* at *16 (citations omitted). Even equitable tolling is not limited to equitable claims; it can be invoked to toll a statute of limitations for claims at law as well. *See, e.g.*, *Tamirie v. Servis One, Inc.*, 2026 WL 1832404, at *3 (Del. Super. Ct. June 23, 2026) (analyzing whether equitable tolling applied to breach of contract claim); *Stoltz Mgmt. of Del., Inc. v. Entrata, Inc.*, 2026 WL 252662, at *5 (Del. Super. Ct. Jan. 30, 2026) (same); *Jeter v. RevolutionWear, Inc.*, 2016 WL 3947951, at *10–11 (Del. Ch. July 19, 2016) (applying equitable tolling to fraudulent inducement claim).

[36] *See Moelis*, 2026 WL 184868, at *16 n.104 (stressing that laches "may dictate that the Court of Chancery bar a presumptively timely lawsuit filed within the analogous limitations period").

This case involves plaintiffs suing after the analogous statutory period. There is thus little to be gained by deciding between the statute of limitations and laches. But the court will follow custom and conduct the analysis anyway.

"If a plaintiff brings a legal claim seeking legal relief in the Court of Chancery, the statute of limitations (and its tolling doctrines) logically should apply strictly and laches should not apply."[37] If a plaintiff brings an equitable claim seeking equitable relief, "the doctrine of laches applies and any applicable statute of limitations would apply only by analogy," but "the Court tends to afford great weight to the analogous statutory period … and may bar a claim without further laches analysis."[38] "When an equitable claim seeks legal relief or a legal claim seeks equitable relief, the Court also will apply the statute of limitations by analogy, but with at least as much and perhaps more presumptive force."[39]

The New Expense Claims assert breaches of the Partnership Agreement and breaches of AT&T's fiduciary duties. The natural remedy for each is an award of money damages. The laches analysis therefore tracks the statute of limitations analysis. For this case, the resulting inquiry has four steps: (1) identifying the limitations period; (2) applying an accrual method; (3) identifying the operative

---

[37] *Kraft*, 145 A.3d at 983.

[38] *Id.*

[39] *Id.*

complaint for purposes of assessing when the claim was asserted, and (4) evaluating

any tolling doctrines.

## 2. The Limitations Period

The first step is to determine the analogous statute of limitations. Delaware's

general statute of limitations states:

> No action to recover damages for trespass, no action to regain possession of personal chattels, no action to recover damages for the detention of personal chattels, no action to recover a debt not evidenced by a record or by an instrument under seal, no action based on a detailed statement of the mutual demands in the nature of debit and credit between parties arising out of contractual or fiduciary relations, no action based on a promise, no action based on a statute, and no action to recover damages caused by an injury unaccompanied with force or resulting indirectly from the act of the defendant shall be brought after the expiration of 3 years from the accruing of the cause of such action; subject, however, to the provisions of §§ 8108-8110, 8119 and 8127 of this title.[40]

The plaintiffs have framed the New Expense Claims as (i) breaches of fiduciary duty

(Counts I and III), (ii) aiding and abetting breaches of fiduciary duty (Count IV); (iii)

unjust enrichment (Count V), (iv) breaches of contract (Count VI), and (v) tortious

---

[40] 10 *Del. C.* § 8106(a).

21

interference with contract (Count VII).[41] A three-year statute of limitations governs each claim.[42]

### 3. Accrual

The second step is to determine when the claims accrued.[43] That date matters because the statute of limitations begins to run from claim accrual.[44]

Delaware is an occurrence-rule jurisdiction, meaning that a cause of action accrues when the wrongful act occurs, even if the plaintiff does not know about the event or the possible cause of action.[45] "The 'wrongful act' is a general concept that varies depending on the nature of the claim at issue. For breach of contract claims,

---

[41] The plaintiffs have not framed Count II as a New Expense Claim. That count asserts a breach of fiduciary duty against the general partner for failing to monitor the Partnership's business and ensure that AT&T appropriately allocated revenue and expenses to the Partnership. That claim does not hinge on the rates AT&T charged the Partnership for interconnect service or caused the Partnership to pay for spectrum.

[42] *See Garfield v. Allen*, 277 A.3d 296, 318 (Del. Ch. 2022) ("The statute of limitations is three years for a claim for breach of fiduciary duty, a claim for breach of contract, and a claim for unjust enrichment."); *Dubroff v. Wren Hldgs., LLC*, 2011 WL 5137175, at *12 (Del. Ch. Oct. 28, 2011) ("Under Delaware law, claims for breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, and unjust enrichment … are generally addressed with reference to a three-year statute of limitations.") (citation omitted); *WaveDivision Hldgs., LLC v. Highland Cap. Mgmt. L.P.*, 2011 WL 5314507, at *9 (Del. Ch. Nov. 2, 2011) ("In Delaware, claims for tortious interference with contractual relations are governed by the three year statute of limitations.") (citing 10 *Del. C.* § 8106), *aff'd*, 49 A.3d 1168 (Del. 2012).

[43] *See US Cellular*, 677 A.2d at 503.

[44] *See Collis*, 287 A.3d at 1195.

[45] *ISN Software Corp. v. Richards, Layton & Finger, P.A.*, 226 A.3d 727, 732 (Del. 2020).

the wrongful act is the breach, and the cause of action accrues at the time of breach. For tort claims, the wrongful act is a tortious act causing injury, and the cause of action accrues at the time of injury. Where the claim is one for indemnification or contribution for damages paid to a third party, a cause of action accrues only after the party seeking indemnification has made payment to the third party."[46] For a tort claim to accrue, a plaintiff does not need to be able to plead quantifiable damages.[47] It is enough that there has been an injury, however slight, to the plaintiff's legal rights.[48]

The plaintiff does not have to know it was injured or to have suffered quantifiable damages for the claim to accrue, even if pleading a justiciable claim would require a concrete injury and quantifiable damages.[49] If a plaintiff does not sue within the limitations period measured from when the claim accrued, then the claim is untimely unless a tolling doctrine applies.

---

[46] *Certainteed Corp. v. Celotex Corp.*, 2005 WL 217032, at \*7 (Del. Ch. Jan. 24, 2005) (citations omitted).

[47] *See ISN Software*, 226 A.3d at 733 n.23.

[48] *See Kaufman v. C.L. McCabe & Sons, Inc.*, 603 A.2d 831, 834 (Del. 1992).

[49] *See ISN Software*, 226 A.3d at 733 ("Under the Delaware occurrence rule, injury is distinct from damages. The statute of limitations can start to run before any 'actual or substantial damages' occur.") (citation omitted).

Delaware courts use three methods to determine when a claim accrues: the discrete act method, the continuing wrong method, and the separate accrual method.[50] Each deals with a different type of injury.

The discrete act method applies when a party suffers injury starting at a distinct point in time and the wrong is effectively complete as of that date, even if it has ongoing effects or implications. To apply that method, "the court starts from when [the act occurred], counts forward to determine when the limitations period would end, and checks whether the plaintiff filed suit within the limitations period."[51]

The continuing wrong method applies when the conduct giving rise to the claim persists over time. The wrongful act "is not complete, and the limitations period does not begin to run, until the continuing wrong ceases."[52] A claim is rarely untimely under this accrual method, because "[i]f any portion of the wrongful act occurs within the limitations period, then the plaintiff can seek to impose liability and recover damages for the entire period covered by the continuing wrong."[53]

Like the continuing wrong method, the separate accrual method applies when the conduct giving rise to the claim continues for a period of time. But under the separate accrual method, the conduct involves a series of interconnected, recurring

---

[50] *See Collis*, 287 A.3d at 1178.

[51] *Id.*

[52] *Id.*

[53] *Id.*

24

acts, like photons in a beam of light or pearls on a string. Under the separate accrual method, a timeliness doctrine can limit how far back the plaintiff can go to challenge wrongful conduct. "[T]he court determines when the plaintiff filed suit, looks back from that point over the length of the limitations period, and checks whether actionable conduct took place within that period."[54]

The parties agree that the separate accrual method applies to the Interconnect Claim. The presumptive actionable period for the Interconnect Claim therefore began three years before the filing of the operative pleading, unless a tolling doctrine would enable the plaintiffs to reach back further. The parties dispute whether the operative pleading is the current complaint, filed on October 27, 2025, or whether the claim relates back to the original complaint, filed on November 28, 2022. If the former, then the plaintiffs can challenge interconnect expense going back to October 28, 2022. If the latter, then the plaintiffs can challenge interconnect expense going back to November 29, 2019. In each case, a tolling doctrine could push back that date.

The parties dispute the correct accrual method for the Spectrum Claim. AT&T argues for the discrete act method, theorizing that the Spectrum Claim challenges a single decision to cause the Partnership to lease spectrum from AT&T, memorialized in the Spectrum Lease executed in 2015. The plaintiffs respond that the Spectrum Lease did not involve a single decision, because the contract gave AT&T discretion to

---

[54] *Id.* at 1179.

add spectrum to the lease and adjust the fees and charges that the Partnership paid. As a result, the plaintiffs argue for applying the separate accrual method.

Each side is partially right. Under Delaware law, the act of entering into a contract is an event that calls for applying the discrete act method.[55] The plaintiffs contend that the Spectrum Lease violated the No-Profit Requirement because it called for the Partnership to pay an arm's-length rate.[56] Any claim that charging an arm's-length rate for spectrum breached the Partnership Agreement or constituted a breach of fiduciary duty accrued in 2015. The plaintiffs did not sue until November 28, 2022. The plaintiffs did not specifically assert the Spectrum Claim until October 27, 2025. Absent tolling, any challenge to the Spectrum Lease is untimely.

Likewise, any challenge to AT&T charging the rates that it established in 2015 for the spectrum it leased to the Partnership accrued in 2015 under the discrete act method. Performance under the contract is treated as a natural consequence flowing from the original wrongful act of entering into the contract.[57] The fact that AT&T

---

[55] *Moelis*, 2026 WL 184868, at *10–11 (contract allegedly voidable under 8 *Del. C.* § 141(e)); *Seaboard*, 625 A.2d at 271 (contract challenged as breach of fiduciary duty).

[56] Ex. 17 § 3.1 ("The Partnership shall pay to [AT&T] the annual charge in equal monthly installments as set forth opposite each Overlap License listed on Exhibit B attached hereto (collectively 'Monthly Charges'), such Monthly Charge being an arm's-length rate based upon an independent expert's valuation of the Overlap Licenses, as such value may be adjusted by the Licensee and agreed to by the Parties in the event the Partnership Market is not identical to the geographic coverage of the Overlap License.").

[57] *Tchrs.' Ret. Sys. of La. v. Aidinoff*, 900 A.2d 654, 666 (Del. Ch. 2006); *Seaboard,* 625 A.2d at 271.

continued to charge those rates for that spectrum does not give rise to new wrongful acts that could generate additional claims. Any challenge to that spectrum and those rights accrued in 2015 and is untimely.

But the plaintiffs also challenge AT&T's subsequent decisions to add spectrum to the Spectrum Lease and to increase the amounts that the Partnership paid. The Spectrum Lease allowed AT&T to do both.[58] AT&T did not take those actions in 2015, nor did AT&T implement them as the straightforward consequence of carrying out the contract. To the extent those decisions were wrongful acts, they were new wrongful acts and gave rise to new claims that accrued when AT&T acted.[59]

---

[58] Ex. 17 § 2.2 ("From time to time during the term of this Agreement, [AT&T] may obtain additional FCC licenses that overlap the Partnership Market (the 'Additional Overlap Licenses'). To the extent that [AT&T] determines in its sole discretion to deploy such Additional Overlap Licenses in the Partnership Market, Exhibit B shall be updated from time to time to reflect the deployment of such licenses and the related charges payable by the Partnership with respect to such Additional Overlap License. Upon such inclusion, references herein to Overlap Licenses will also include any such Additional Overlap Licenses."); *id.* § 3.1 (providing that charges "may be adjusted by [AT&T] and agreed to by the Parties").

[59] *Aidinoff*, 900 A.2d at 666 (treating decision not to exercise contractual termination right as wrongful act distinct from original decision to enter into contract for purposes of claim accrual and statute of limitations); *see Dweck v. Nasser*, 2012 WL 161590, at *22 (Del. Ch. Jan. 18, 2012) ("Like the defendants in *Aidinoff*, Nasser could have discontinued the RAJN payments at any time. Each payment represented a discrete decision to perpetuate an unfair course of conduct. Each payment is therefore evaluated separately for laches. That doctrine bars any challenge to payments made more than three years before Dweck filed her complaint. Challenges to later payments are not time-barred."); *Sutherland v. Sutherland*, 2010 WL 1838968, at *5 n.19 (Del. Ch. May 3, 2010) (agreeing that when a contract permitted a fiduciary to bill amounts to the company, "the statute of limitations would not begin to run until a Choctaw overage was charged to Dardanelle's account. It would then accrue upon, and for, each payment.") (citation omitted). The court in *Coca-Cola* rejected this line of reasoning, relying on *Seaboard*. *See In re Coca-Cola Enters., Inc.*,

27

For purposes of accrual analysis, therefore, the separate accrual method applies to spectrum that AT&T added or changes in the fees it charged. But when advancing any challenges to the addition of new spectrum or adjustments to rates, the plaintiffs must litigate in a world in which, because of timeliness principles, they can no longer challenge the contract that allowed AT&T to add spectrum to the lease or make those adjustments.[60] Given that reality, the plaintiffs are likely limited to challenging whether AT&T's actions complied with the terms of the contract.

As with the Interconnect Claim, the separate accrual method applies to the Spectrum Claim. The presumptive actionable period therefore began three years before the filing of the operative pleading. The parties dispute whether the operative pleading is the current complaint, filed on October 27, 2025, which would allow the plaintiffs to challenge spectrum charges going back to October 28, 2022, or the original complaint, filed on November 28, 2022, which would allow the plaintiffs to challenge spectrum charges going back to November 29, 2019. In each case, a tolling doctrine could push back that date.

### 4. Determining The Operative Complaint

Under the separate accrual method, the plaintiffs can challenge events that occurred within a look-back period equal in length to the statute of limitations

---

2007 WL 3122370, at *6 n.45 (Del. Ch. Oct. 17, 2007), *aff'd sub nom. Int'l Bhd. Teamsters v. Coca-Cola Co.*, 954 A.2d 910 (Del. 2008) (TABLE). *Seaboard*, however, did not involve the exercise of discretionary rights; it simply involved ongoing management fees charged under a contract. *See Seaboard,* 625 A.2d at 271.

[60] *See Hokanson v. Petty*, 2008 WL 5169633, at *5–6 (Del. Ch. Dec. 10, 2008).

measured from when they asserted their claims. When a plaintiff asserts a new claim in a later pleading, the look-back period runs from the later pleading unless the newly asserted claim related back to an earlier pleading.

Court of Chancery Rule 15(c) governs when an amendment relates back to the original complaint's filing date.[61] It states:

> Relation Back of Amendments. An amendment to a pleading relates back to the date of the original pleading when:
>
> (1) the law that provides the applicable statute of limitations allows relation back;
>
> (2) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; or
>
> (3) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(2) is satisfied and, within 120 days of the filing of the complaint, or such additional time the Court allows for good cause shown, the party to be brought in by amendment:
>
>     (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits; and
>
>     (B) knew or should have known that, but for a mistake concerning the identify of the proper party, the action would have been brought against the party.[62]

The plaintiffs rely on Rule 15(c)(2).

This court has explained that "[t]he relation back doctrine is grounded in equity, and its purpose is to 'ameliorate the harsh result of the strict application of

---

[61] Ct. Ch. R. 15(c).

[62] *Id.*

29

the statute of limitations' when the defendant should have had notice of the claims."[63] "[I]f [a] plaintiff attempts to allege an entirely different transaction by amendment, Rule 15(c) [] will not authorize relation back."[64] "[A] separate independent violation of the same contract provision does not 'arise' out of the same conduct, transaction or occurrence as did the first, unrelated violation."[65] Nor does a "general principle" that serves as the theme of an original complaint act as "the same as a legal claim" for purposes of asserting a later pleading.[66] A court will also evaluate whether the opposing party will be "unduly surprised or prejudiced."[67]

Interpretations of the analogous federal rule serve as persuasive authority for Rule 15(c). A leading treatise explains that the federal analogue

> is based on the notion that once litigation involving particular conduct or a given transaction or occurrence has been instituted, the parties are not entitled to the protection of the statute of limitations against the later assertion by amendment of … claims that arise out of the same conduct, transaction, or occurrence as set forth in the original pleading.[68]

---

[63] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 2012 WL 4503731, at \*3 (Del. Ch. Oct. 1, 2012).

[64] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs.*, 2012 WL 3201139, at \*17 (Del. Ch. Aug. 7, 2012) (citation omitted).

[65] *Id.* at \*18.

[66] *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 2015 WL 6157759, at \*21 (Del. Ch. Oct. 20, 2015), *aff'd*, 151 A.3d 447 (Del. 2016) (TABLE).

[67] *Buttonwood Tree Value P'rs, L.P. v. R.L. Polk & Co., Inc.*, 2023 WL 9053173, at \*10 (Del. Ch. Dec. 29, 2023).

[68] 6A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1496 (3d ed. 2010), Westlaw (database updated Apr. 2026).

Amendments that "merely correct technical deficiencies or expand or modify the facts alleged in the earlier pleading" or that "do no more than restate the original claim with greater particularity or amplify the details of the transaction alleged in the preceding pleading" relate back under Rule 15(c).[69] "Amendments that go beyond the mere correction or factual modification of the original pleading and significantly alter the claim or defense alleged in that pleading are treated more cautiously."[70]

When determining whether an amendment will relate back, a court evaluates whether the two pleadings arise from "a common core of operative facts."[71] A court also gives weight to whether the amendment will "have a substantial impact on the merits of the case and may require the opposing party to prepare the case a second time."[72] When considering that burden, the court will take into account whether "the opposing party has been put on notice regarding the claim or defense raised by the amended pleading."[73] If the amended pleading makes changes that are "so substantial that it cannot be said that defendant was given adequate notice of the conduct, transaction, or occurrence that forms the basis of the new claim or defense,

---

[69] *Id.* § 1497.

[70] *Id.*

[71] *Id.*

[72] *Id.*

[73] *Id.* (collecting cases).

then the amendment will not relate back."[74] When assessing notice, a court should consider whether, based on the record in the litigation as a whole, a reasonably prudent person "ought to have been able to anticipate or should have expected that the character of the originally pleaded claim might be altered or that other aspects of the conduct, transaction, or occurrence set forth in the original pleading might be called into question."[75]

Under those principles, the Interconnect Claim relates back, but the Spectrum Claim does not. The plaintiffs' original complaint asserted that AT&T allocated revenue and expenses unfairly using the NPA-NXX methodology despite knowing that the methodology was unfair and despite developing superior methodologies in the Sharing Agreements. The Interconnect Claim simply calls out another specific type of expense that AT&T allocated unfairly using the NPA-NXX methodology. AT&T knew the categories of revenue and expenses that it allocated using the NPA-NXX methodology, and a reasonable litigant in AT&T's position should have anticipated that the litigation could put at issue any and all of those categories. By adding the Interconnect Claim, the plaintiffs supplied additional detail about a category of misallocated expense.

The Spectrum Claim does not relate back. That claim rested on a new agreement—the Spectrum Lease—and amounts AT&T charged under it. The

---

[74] *Id.*

[75] *Id.*

Spectrum Claim asserts that AT&T's conduct under the Spectrum Lease violated the No-Profit Requirement, which the original complaint had not identified. A party in AT&T's position would not have anticipated a challenge to the Spectrum Lease.

The plaintiffs argue broadly that their original compliant challenged "AT&T's failure to implement a fair accounting scheme in breach of its contractual and fiduciary duties."[76] As a practical matter, however, that expansive framing claims that AT&T should have been on notice that every one of its interactions with the Partnership were subject to challenge. That is too broad. AT&T had reason to know that its NPA-NXX allocations were at issue. AT&T did not have reason to anticipate a challenge to the Spectrum Lease or the amounts charged under it.

The plaintiffs further argue that the Spectrum Claim can relate back because AT&T cannot show that it was unduly surprised or prejudiced. The test under Rule 15(c) is whether the amended pleading arises out of a common nucleus of operative fact. Even if it does, a court can take into account whether the amendment will impose surprise or prejudice. If so, then the court may exercise its discretion to deny the amendment. The assessment of surprise and prejudice dovetails with the question of notice, because a party that had or should have been on notice is less likely to be able to claim surprise or prejudice, and vice versa. The analysis in this case never reaches that later step, because the Spectrum Claim does not arise out of a common nucleus of operative fact with the NPA-NXX allegations in the original complaint.

---

[76] AB at 11.

The Interconnect Claim therefore relates back to the original complaint filed on November 28, 2022. Absent tolling, the plaintiffs can challenge the allocations of interconnect expense dating back to November 29, 2019.

The Spectrum Claim does not. It was not introduced until October 27, 2025. Absent tolling, the plaintiffs can challenge the addition of new spectrum to the Spectrum Lease or changes to the charges under that agreement dating back to October 28, 2022.

### 5. Tolling

The final issue is tolling. The plaintiffs rely on equitable tolling and fraudulent concealment in an effort to reach back further in time to challenge earlier transactions. It is reasonably conceivable that equitable tolling could apply, but it is also possible that the plaintiffs were on inquiry notice for the New Expense Claims. The court cannot resolve the pivotal facts at the pleading stage. Because the doctrine of fraudulent concealment is less favorable to the plaintiffs than the doctrine of equitable tolling, this decision does not reach it.

#### a. Equitable Tolling

"[T]he doctrine of equitable tolling stops the statute from running while a plaintiff has reasonably relied upon the competence and good faith of a fiduciary."[77] "The obvious purpose of the equitable tolling doctrine is to ensure that fiduciaries cannot use their own success at concealing their misconduct as a method of

---

[77] *In re Tyson Foods, Inc.*, 919 A.2d 563, 585 (Del. Ch. 2007).

immunizing themselves from accountability for their wrongdoing."[78] In the corporate context, "a stockholder is entitled to rely on the good faith of directors such that a claim for breach of fiduciary duty would not arise until the stockholder had actual knowledge of the wrong or was placed on inquiry notice."[79] "Since trust and good faith are the essence of this relationship, it would be corrosive and contradictory for the law to punish reasonable reliance on that good faith by applying the statute of limitations woodenly or automatically to alleged self-interested violations of trust."[80] Those principles apply by analogy to the relationship between limited partners and the general partner of a limited partnership.

The plaintiffs allege that AT&T and the Partnership entered into the Spectrum Lease in September 2015. They point out the same AT&T employee signed the agreement for both AT&T and the Partnership. They also allege that AT&T never provided the plaintiffs with a copy. They further contend that Eric Wages, the AT&T employee in charge of interacting with the Partnership, never told the partners that AT&T was charging for spectrum above cost. Instead, they assert generally that he told them AT&T was charging for spectrum at cost, despite knowing otherwise.

Even without the asserted misrepresentation, AT&T's silence about the nature of the transactions under the Spectrum Lease is sufficient to support an inference of

---

[78] *In re Am. Int'l Gp.*, 965 A.2d 793, 813 (Del. Ch. 2009), *aff'd sub nom. Tchrs.' Ret. Sys. of La. v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011) (TABLE).

[79] *Collis*, 287 A.3d at 1218.

[80] *Seaboard*, 625 A.2d at 275.

equitable tolling. The plaintiffs were entitled to rely on AT&T's good faith until put on notice otherwise.

The analysis is similar for the Interconnect Claim. The plaintiffs allege that AT&T never informed the plaintiffs that it was charging them more than cost. In fact, the plaintiffs point to the Partnership's financial statements for the years 2010 and 2011, where AT&T stated that interconnect service was "charged to the Partnership at [AT&T's] cost and are allocated primarily based on end of period subscribers." [81] AT&T responds that the same financial statements disclosed that AT&T allocated interconnect services based on a "proportionate share of minutes of use and data activity,"[82] but that statement was not sufficiently clear to defeat equitable tolling. The plaintiffs were entitled to rely on AT&T's good faith.

### b. Fraudulent Concealment

The doctrine of fraudulent concealment is narrower than the doctrine of equitable tolling. The latter applies where a beneficiary can rely on the good faith of its fiduciary. The former does not require a fiduciary relationship and allows a court to disregard the statute of limitations "'when a defendant has fraudulently concealed from a plaintiff the facts necessary to put [the plaintiff] on notice of the truth.'"[83] The plaintiff "must allege an affirmative act of 'actual artifice' by the defendant that either

---

[81] AB at 45 (quoting Ex. 18 Note 5).

[82] OB at 38 (quoting Ex. 18 at 17).

[83] *LGM Hldgs., LLC v. Schurder*, 340 A.3d 1134, 1146 (Del. 2025) (quoting *Tyson Foods*, 919 A.2d at 585) (alteration in original).

prevented the plaintiff from gaining knowledge of material facts or led the plaintiff away from the truth."[84] "The rationale for this doctrine is to disallow a defendant from taking advantage of his own wrong in preventing a plaintiff from [filing] a timely suit in the courts."[85]

Because fraudulent concealment requires actual artifice and *scienter*, it requires that a plaintiff make a greater showing than required for equitable tolling. This decision has already held that equitable tolling inferably applies. This decision therefore need not consider whether fraudulent concealment also applies.

### c. Inquiry Notice

Under Delaware law, inquiry notice universally limits tolling doctrines.[86] A plaintiff cannot invoke tolling doctrines beyond the point when the plaintiff "was objectively aware, or should have been aware, of facts giving rise to the wrong."[87] "Even where a defendant uses every fraudulent device at its disposal to mislead a victim or obfuscate the trust, no sanctuary from the statute will be offered to the

---

[84] *Tysons Foods*, 919 A.2d at 585 (citing *Ewing v. Beck*, 520 A.2d 653, 667 (Del. 1987)).

[85] *Allen v. Layton*, 235 A.2d 261, 265 (Del. Super. Ct. 1967), *aff'd*, 246 A.2d 794 (Del. 1968).

[86] *See Collis*, 287 A.3d at 1212.

[87] *Tyson Foods*, 919 A.2d at 585.

37

dilatory plaintiff who was not or should not have been fooled."[88] In other words, even though equitable tolling inferably applies, inquiry notice could cut off that doctrine.

"Inquiry notice does not require full knowledge of the material facts; rather, plaintiffs are on inquiry notice when they have sufficient knowledge to raise their suspicions to the point where persons of ordinary intelligence and prudence would commence an investigation that, if pursued would lead to the discovery of the injury."[89] "Once the plaintiff is aware of the injury, or should have discovered it in the exercise of reasonable diligence, then the period for bringing a claim starts to run."[90]

AT&T argues that the plaintiffs were on inquiry notice for purposes of the Interconnect Claim because AT&T "indisputably spelled out for the Partnership[], starting with the 2010-11 financial statements (sent in 2013), that is was using the exact methodology for assigning interconnect expenses Plaintiffs now belatedly complain about more than ten years later."[91]

That is an exaggeration. The "Related-Party Transactions" section of the Partnership's 2010–2011 financial statements stated:

> [AT&T] provides services to the Partnership, which includes network interconnection and switching …. Such services are charged to the

---

[88] *Id.*

[89] *Ontario Provincial Council of Carpenters' Pension Tr. Fund v. Walton*, 294 A.3d 65, 96 (Del. Ch. 2023) (quoting *Pomeranz v. Museum P'rs, L.P.*, 2005 WL 217039, at *3 (Del. Ch. Jan. 24, 2005)).

[90] *Id.* (citing *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *6 (Del. Ch. July 17, 1998), *aff'd*, 725 A.2d 441 (Del. 1999) (TABLE)).

[91] OB at 37–38.

Partnership at [AT&T's] cost and are allocated primarily based on end of period subscribers, network usage, gross customer additions and customer service call volumes.[92]

The financial statements also disclosed that "[e]ffective January 1, 2011, [AT&T] began allocating interconnect costs to the Partnership based on the Partnership's proportionate share of minutes of use and data activity on [AT&T's] national network, to more closely align the costs recorded with the Partnership's use of [AT&T's] national network."[93]

Those disclosures speak of charging interconnect expense at cost. AT&T did not clearly disclose the method it was using to charge the Partnership for interconnect service. The 2010–2011 financial statements are not sufficiently clear to establish at the pleading stage that the plaintiffs were on inquiry notice for the Interconnect Claim.

The same is true for the Spectrum Claim. AT&T argues that Plaintiffs had notice of the Spectrum Claim through "detailed disclosures in financial statements provided to the Partners when the challenged practices began."[94] AT&T relies on the 2014–2015 financials for the Partnership, which stated:

> [AT&T] holds certain FCC licenses that are used by the Partnership to provide wireless communications services. Prior to July 2015, [AT&T] did not charge the Partnership for use of these licenses. In July 2015, AT&T began charging the Partnership for certain licenses owned by [AT&T] or its affiliates.

---

[92] Ex. 18 Note 5.

[93] *Id.* at 17.

[94] OB at 40.

* * *

> Spectrum Use Service Agreements. On September 8, 2015, the Partnership entered into a series of agreements with multiple AT&T affiliates with an effective date of July 1, 2015 for the exclusive use of multiple FCC spectrum licenses owned by AT&T some of which were previously being used by the Partnership. The agreements have an initial term of 20 years and renew automatically for 20 years.[95]

That disclosure merely informed the plaintiffs of the existence of the Spectrum Lease. It did not make the plaintiffs "objectively aware" that AT&T charged for spectrum at rates above AT&T's cost.[96]

The 2014–2015 financial statements also stated that "[t]he Partnership's 2015 statement of operations reflects $2,383 of cost of services related to these agreements."[97] That disclosure again did not state whether the amount reflected AT&T's cost. More disclosure was required to prevent the plaintiffs from being able to rely on AT&T's good faith.

AT&T last argues that the Contract Decision, the Fiduciary Duty Decision, and litigation pending in the United States District Court for Southern District of Texas should have put the plaintiffs on notice of their claims.

AT&T contends that the Contract Decision and Fiduciary Duty Decision gave the plaintiffs "reason to be 'suspicious' specifically with respect to AT&T's spectrum

---

[95] OB at 40–41 (quoting Ex. 23 at 12, 22).

[96] *Tyson Foods*, 919 A.2d at 585.

[97] Ex. 23 at 22.

40

and interconnect accounting."[98] AT&T also claims that the *VTX* litigation put the plaintiffs on notice because the complaint there "alleged that AT&T's 2015 disclosures of the spectrum leases revealed that those leases were 'one-sided' and that AT&T was overcharging the Partnerships."[99] AT&T also argues that a summary judgment motion in that case, filed publicly in 2022, included a detailed description of the spectrum leases and alleged that they "represented the execution of AT&T's plan to systematically retain valuable assets for itself while forcing the Partnerships to bear the economic burden of those assets.'"[100] AT&T points to two decisions from the United States District Court for the Southern District of New York as support for its argument that the *VTX* litigation was enough to put the plaintiffs on notice.[101]

Crediting AT&T's argument would amount to requiring the plaintiffs to monitor litigation nationwide, including reviewing public filings, then act on the information they contained, lest they lose the ability to sue. That gets the analysis backwards. The plaintiffs were entitled to rely on AT&T's good faith as a fiduciary until they came across information sufficient to put them on inquiry notice. Discovery

---

[98] OB at 44.

[99] *Id*. at 42.

[100] *Id*. at 42–43 (citation omitted).

[101] *Id*. at 43 (citing *Weiss v. La Suisse, Societe D'Assurances Sur La Vie*, 381 F.Supp. 2d 334, 339 (S.D.N.Y. 2005) and *Korwek v. Hunt*, 646 F.Supp. 953, 958 (S.D.N.Y. 1986), *aff'd*, 827 F.2d 874 (2d Cir. 1987)).

may show that the plaintiffs knew about and considered prior litigation filings. At this stage of the case, the court cannot make that determination.

### 6. Summarizing The Timeliness Analysis

The New Expense Claims are subject to the separate accrual method. The plaintiffs can use the Interconnect Claim to challenge expenses beginning on November 29, 2019. The plaintiffs can use the Spectrum Claim to challenge expenses beginning on October 28, 2022. Equitable tolling may push those dates back further, but no earlier than the point when the plaintiffs were on inquiry notice. Those determinations cannot be made at the pleading stage.

## B. The Merits Defense

AT&T separately argues that the New Expense Claims fail to state claims for breach of contract. To the extent the complaint asserts that AT&T breached the Partnership Agreement by causing the Partnership to contract with an affiliate, that claim fails as a matter of law. Otherwise, the complaint pleads actionable breaches of the Partnership Agreement.

### 1. The Governing Law

Delaware law governs the Partnership Agreement.[102] The elements of a claim for breach of contract under Delaware law are "(i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) a casually related injury that

---

[102] *See* Ex. 1 § 19.6.

42

warrants a remedy, such as damages or in an appropriate case, specific performance."[103]

No one disputes that the Partnership Agreement is a valid contract. Whether the complaint's allegations state a claim against AT&T for breach presents questions of contract interpretation.

Under Delaware law, the role of a court when interpreting a contract is "to effectuate the parties' intent."[104] Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[105] "Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning."[106] "Contract language is not ambiguous merely because the

---

[103] *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *47 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021); *cf. Seaboard*, 625 A.2d at 271 ("Any such wrong occurred at the time that enforceable legal rights against Seaboard were created. Suit could have been brought immediately thereafter to rescind the contract and for nominal damages which are traditionally available in contract actions. Complete and adequate relief, if justified, could be shaped immediately or at any point thereafter.").

[104] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006); *accord Exelon Generation Acqs., LLC v. Deere & Co.*, 176 A.3d 1262, 1267 (Del. 2017) (observing that when interpreting contracts, the court "should focus on the parties' shared expectations at the time they contracted.").

[105] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal quotation marks omitted).

[106] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012); *accord Terrell v. Kiromic Biopharma, Inc.*, 338 A.3d 1272, 1276 (Del. 2025) ("When the contract is clear and unambiguous, [the court] will give effect to the plain-meaning of

43

parties dispute what it means."[107] "To be ambiguous, a disputed contract term must be fairly or reasonably susceptible to more than one meaning."[108] "Delaware courts will not destroy or twist [contract] language under the guise of construing it."[109] "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent."[110]

"In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein."[111] The Delaware Supreme Court has also instructed that "[t]he basic business relationship between parties must be understood to give sensible life to any contract."[112] A reasonable

---

the contract's terms and provisions unless it appears the parties intended a special meaning.") (internal quotation marks omitted).

[107] *Alta Berkeley*, 41 A.3d at 385; *accord Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021) ("The parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous.") (internal quotation marks omitted).

[108] *Alta Berkeley*, 41 A.3d at 385; *see Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195–96 (Del. 1992).

[109] *Rhone-Poulenc*, 616 A.2d at 1195.

[110] *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

[111] *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985).

[112] *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 927 (Del. 2017).

reading therefore must be "situated in the commercial context between the parties."[113] But this principle cannot be used to override the plain language of the agreement. "While [Delaware courts] have recognized that contracts should be 'read in full and situated in the commercial context between the parties,' the background facts cannot be used to alter the language chosen by the parties within the four corners of their agreement."[114]

When ruling on a Rule 12(b)(6) motion, a court cannot resolve contractual ambiguity.[115] Dismissal is proper "only if the defendants' interpretation is the *only* reasonable construction as a matter of law."[116] "If the Plaintiff has offered a reasonable construction of the contract, and that construction supports the claims

---

[113] *Id.* at 926–27.

[114] *Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810, 820 (Del. 2018) (quoting *Chi. Bridge*, 166 A.3d at 926–27).

[115] *Schurder*, 340 A.3d at 1143–44 ("When interpreting a contract on a motion to dismiss, the trial court cannot choose between two differing reasonable interpretations of ambiguous provisions.") (internal quotation marks omitted); *accord Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996) ("On a motion to dismiss for failure to state a claim, a trial court cannot choose between two differing reasonable interpretations of ambiguous documents.").

[116] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003) (emphasis in original); *accord Caspian Alpha Long Credit Fund, L.P. v. GS Mezzanine P'rs 2006, L.P.*, 93 A.3d 1203, 1205 (Del. 2014).

asserted in the complaint, then the Court must deny the motion to dismiss even if the defendant's construction is also reasonable."[117]

### 2. The Claim For Breach Of The No-Profit Requirement

The complaint alleges that AT&T breached the No-Profit Requirement by providing interconnect and spectrum management services for more than AT&T's cost. That theory states a claim on which relief can be granted. At a minimum, the plaintiffs have offered one reasonable reading of the Partnership Agreement.

The Partnership Agreement mandates that the General Partner provide "management and accounting services to the Partnership consisting of, but not limited to, maintaining books of record, … preparing accounting reports (in accordance with generally accepted accounting principles …), and other records or reports."[118] Under the same section, the General Partner may provide "certain other services necessary for the Partnership to carry on and expand its activities and functions, including but not limited to, real estate management, advertising, legal, office personnel management, engineering, marketing and the like."[119] As to the services contemplated by the Services Provision, the General Partner "shall be

---

[117] *Cont'l Auto. Sys., Inc. v. Nokia Corp.*, 2023 WL 1370523, at *19 (Del. Ch. Jan. 31, 2023) (internal quotation marks omitted); *accord Anschutz Corp. v. Brown Robin Cap., LLC*, 2020 WL 3096744, at *9 (Del. Ch. June 11, 2020) ("If the plaintiff has proffered a reasonable construction that supports its allegations of breach, dismissal must be denied.").

[118] PA § 4.1.

[119] *Id.*

46

reimbursed by the Partnership monthly for any reasonable and necessary expenses … plus reasonable and necessary administrative and general overhead expenses, including but not limited to, marketing, maintenance, message charges, facilities, engineering, legal, accounting and audit fees, development and implementation of billing procedures, expenses of preparing tax returns and reports, taxes, travel, office rent, telephone, salaries …, and any and all other business expenses incurred by the General Partner in connection with the provision of Cellular Service." [120] That provision contains the No-Profit Requirement, which specifies that "[t]he General Partner shall not be entitled to any profit in rendering such services to the Partnership."[121]

AT&T points to other provisions in the Partnership Agreement. The Asset Provision addresses the assets needed to provide Cellular Service and authorizes AT&T to cause the Partnership "to purchase, lease or otherwise acquire and hold … such real and personal property, equipment, software and other assets required to provide Cellular Service," including by transacting with AT&T.[122] It contains the Arm's-Length Requirement and specifies that "use of such assets may be provided to

[120] *Id.* § 4.2.

[121] *Id.*

[122] *Id.* § 4.3.

47

the Partnership upon terms and conditions reasonably comparable to those which the Partnership could obtain at arm's-length from unaffiliated parties."[123]

Finally, the Affiliate-Transaction Provision sweeps broadly and allows AT&T to cause the Partnership to enter into transactions with affiliates. It contains the loosest standard, requiring only that "the terms and conditions of such transactions are comparable to, or not substantially less favorable than, similar arms'-length transactions between the General Partner or its Affiliate and unrelated third parties" and that AT&T has not been grossly negligent or engaged in willful misconduct when setting the terms.[124] That standard turns on the process AT&T followed and its intent.

The Services Provision, the Asset Provision, and the Affiliate-Transaction Provision thus address a different type of interested-party transaction. The Affiliate-Transaction Provision is the most general and inferably applies to all affiliate transactions. The Asset Provision applies to the purchase, lease, or acquisition of assets required to provide Cellular Service.

Each of the provisions implicates a different contractual standard. The Affiliate-Transaction Provision implicates the Conduct Standard. The Asset Provision implicates the Arm's-Length Requirement. The Services Provision implicates the No-Profit Requirement.

---

[123] *Id.*

[124] *Id.* § 7.5.

Under one version of the New Expense Claims, the plaintiffs contend that AT&T breached the No-Profit Requirement by failing to charge for interconnect and spectrum management services at cost. At the pleading stage, it is not possible to determine definitively which provision applies to the interconnect and spectrum charges. At a minimum, they are subject to the Affiliate-Transaction Provision. It seems most likely that they are subject to the Asset Provision. The plaintiffs seek to characterize them as services subject to the Services Provision. While nothing compels that interpretation, it is reasonably conceivable.

AT&T interprets the Partnership Agreement differently. According to AT&T, the different provisions do not apply based on transaction type but rather based on what entity serves as the counterparty or service provider. AT&T maintains that if the AT&T affiliate that serves as the General Partner is the counterparty or service provider, then the Services Provision applies with the No-Profit Requirement. AT&T maintains that if a different AT&T entity serves as the counterparty or service provider, than either the Asset Provision and the Arm's-Length Requirement apply, or the Affiliate-Transaction Provision and the Conduct Standard apply.

AT&T offers no means of distinguishing between the latter two provisions and treats the standards as equivalent, even though they impose different tests. The Conduct Standard contemplates terms "not substantially less favorable than" arm's-length transactions, a more flexible standard than the straightforward arm's-length standard in the Arm's-Length Requirement. The Conduct Standard also does not follow the Arm's-Length Requirement in looking at the terms the Partnership could

obtain from unaffiliated third parties; it rather examines "arms'-length transactions between the General Partner or its Affiliate and unrelated third parties," a potentially different test. Last, the Conduct Standard is not breached by non-arm's-length terms. It can only be breached if AT&T engaged in gross negligence or willful misconduct. By treating the standards as if they were the same, AT&T seems to have come up with a reading designed to defeat the plaintiffs' specific claim, rather than attempting to read the Partnership Agreement as a whole. That makes AT&T's interpretation less persuasive.

AT&T has offered one reasonable reading, but not the only one. At the pleading stage, the court cannot reasonably infer that the AT&T affiliate that served as the General Partner would be providing all of the services itself, or even any of the services. One reasonable and plaintiff-friendly inference is that AT&T did not set up its subsidiaries as self-sufficient units that could provide management and support services independently. It is reasonably conceivable that AT&T instead created the affiliate that served as the General Partner for purposes of asset partitioning and liability protection and not because it was a standalone entity that could supply all of the services the Partnership needed. It is reasonably conceivable that the No-Profit Requirement applied to services that AT&T provided more broadly.

Based on a cold read, it seems more likely that the Partnership Agreement sought to categorize affiliate transactions by type rather than by the AT&T affiliate serving as counterparty or service provider. AT&T's entity-based approach would provide little protection for the Partnership and the plaintiffs, because corporate

50

structure is malleable. AT&T could move the capability to provide particular services into and out of particular affiliates directly or by contract and evade the reading AT&T now offers.

At this point of the case, the court cannot conclude that AT&T's reading is the only reasonable one. AT&T appears to have drafted an ambiguous contract and must now live with the results. Extrinsic evidence may make clear how the competing provisions operate or what services fall into which bucket.

### 3. The Claim For Breach Of Section 4.4

The plaintiffs separately argue that Section 4.4 of the Partnership Agreement required the General Partner "to transfer all licenses necessary to provide Cellular Service to the Partnership" and that the General Partner failed to do so.[125] The plaintiffs contend that AT&T "acquired spectrum licenses in its own name and caused the Partnerships to enter into 'services agreements' to pay for use of that spectrum."[126] That theory states a claim on which relief could be granted.

Section 4.4 states that "[t]he General Partner shall, on behalf of the Partnership and consistent with Section 13.1, (a) cause to be transferred to the Partnership's name all licenses, permits or other regulatory approvals necessary to provide Cellular Service."[127] This is another ambiguous provision. The most likely

---

[125] AB at 28.

[126] *Id.*

[127] PA § 4.4.

reading is that it requires the Partnership to hold in its name the licenses, permits and regulatory approvals necessary to provide Cellular Service in the CMAs where it operated. But because the definition of Cellular Service is broad, and because the Partnership's business could expand to other geographic areas, the scope of this provision could potentially expand.

Assuming the more constrained reading, the Spectrum Lease recites that AT&T obtained spectrum used to provide Cellular Service in the geographic area where the Partnership operated.[128] Those recitals evidence—even confess—a breach of Section 4.4.

AT&T objects that the plaintiffs have not expressly identified Section 4.4 in their complaint, but that is not necessary. The complaint put AT&T fairly on notice that the plaintiffs are challenging the Spectrum Lease. From a timeliness perspective, absent tolling, the plaintiffs are presumptively barred from challenging the original terms of the Spectrum Lease. But if equitable tolling applies, or to the extent AT&T has added spectrum to the Spectrum Lease within the look-back period, then the plaintiffs have stated a claim for breach of Section 4.4 of the Partnership Agreement.

---

[128] Ex. 17 at 1 ("[AT&T] holds various wireless telecommunications licenses, as more particularly described on Exhibit B hereto (the 'Overlap Licenses'), authorizing it to provide wireless telecommunications services in the Partnership Market"); *id.* ("the Parties desire to enter into this Agreement to document the deployment of the Overlap Licenses in the Partnership Market and implement a mechanism by which the Partnership can compensate [AT&T] for the economic benefits the Partnership derives from the Overlap Licenses").

At some point, the parties will have to deal with the ambiguity created by the Asset Provision. That section allows AT&T to "acquire and hold in the name of the Partnership … such real and personal property, equipment, software and other assets required to provide Cellular Service."[129] A license to use spectrum is a type of asset, so arguably AT&T could hold it for the Partnership's benefit. It seems more likely that Section 4.4 operates as a more specific provision addressing licenses and therefore controls in lieu of the Asset Provision. All that can be said at this stage is that a breach of this provision is reasonably conceivable. The claim is not subject to pleading-stage dismissal.

## III.   CONCLUSION

The motion to dismiss is denied. That said, the parties must proceed in accordance with the rulings in this decision.

---

[129] PA § 4.3.